## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDRE EVERETT | * | |
| Plaintiff | * | |
| v | * | Civil Action No. WMN-15-2150 |
| WEXFORD MEDICAL INC., et al. | * | |
| Defendants | * | |

\*\*\*

### MEMORANDUM

Pending are Motions to Dismiss or for Summary Judgment filed by Defendant Wexford Medical Inc. ("Wexford") (ECF 13) and Warden Kathleen Green and Lt. Murphy ("Correctional Defendants") (ECF 16).  Plaintiff opposes the motions (ECF 19, 20, 21, and 22).  The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the Motions to Dismiss or for Summary Judgment, construed as Motions for Summary Judgment, shall be granted.

Also pending is Wexford's Motion to Seal (ECF 14) medical records filed in support of the Motion to Dismiss or for Summary Judgment. The motion to seal shall be granted in part; the Clerk will be directed to restrict access to medical records attached as Exhibit 1 to case participants.

### Background

#### Plaintiff's Allegations

Plaintiff Andre Everett is a prisoner committed to the custody of the Department of Public Safety and Correctional Services ("DPSCS") and confined at Eastern Correctional Institution ("ECI").  He states he suffers from congenital glaucoma and claims that on October 9,

2001, Dr. Doyle[1] put ear drops in his left eye, resulting in a total loss of vision in that eye. ECF 1 at p. 5. Plaintiff recalls that the drops used by Dr. Doyle caused such intense pain to his eye that he "jumped up from the chair." *Id.* When Plaintiff reported to the nurses what had occurred, he was immediately transported to "Robin Wood Hospital" in Washington County. *Id.* When he arrived Plaintiff's eye was evaluated and he was told there was nothing that could be done for the eye. He was then transported to the University of Maryland Hospital where he was seen by Dr. Lacove and Dr. Accall. Plaintiff states that he was informed by Lacove and Accall that ear drops had been put into his eye, that the damage was irreparable, and the only option was to have the eye removed. *Id.*

Plaintiff claims that since that event, he has requested to be seen by an eye specialist; to have glasses and sunglasses provided at the State's expense; and to be assigned to a single cell. He asserts his requests have been to no avail and that the "institution" has failed to give him a single cell or provide glasses or sunglasses. He states he requires a single cell because he has to view objects at a close range and medical staff has requested correctional staff to assign him to a single cell. *Id.* at pp. 5 – 6.

As relief, Plaintiff seeks one-million dollars in damages for the loss of his eye sight and for failure to provide him with "proper treatment." *Id.* at p. 3.

<u>Wexford's Response</u>

Wexford Health Sources, Inc. provided no contractual services with the State of Maryland prior to July 1, 2005. Beginning July 1, 2005, Wexford's contractual service was as the "utilization review management provider" which required review of requests for referrals of non-emergent specialty care and treatment, followed by appropriate action. ECF 13 at Ex. 2, pp.

---

[1]     Dr. Doyle is a named Defendant, but was never served with the Complaint. For reasons more fully explained herein, the Complaint as to Dr. Doyle will be dismissed.

1 – 2. On July 1, 2012, Wexford became the contractual, primary medical contractor for prisoners in Maryland's DPSCS. Prior to July 1, 2012, none of the healthcare providers who treated prisoners in Maryland were employed by Wexford. *Id.*

With regard to Plaintiff's care, Dr. Jason Clem provides a statement under oath supported by relevant medical records. ECF 13 at Ex. 3, *see also* Ex. 1. He states that Plaintiff has congenital end-stage glaucoma and has been legally blind in his left eye since 2001. Dr. Clem asserts that Plaintiff is seen on a regular basis as a chronic care patient by medical providers, opthalmologists, and optometrists. In that context, Plaintiff is prescribed eye drops including Pred Forte, Xalatan, Atropine, Brimonidine, Tartate, Cosopt, and Timoptic. Additionally, Plaintiff is provided with eye patches to protect his eyes and reduce irritation from light exposure. *Id.* at Ex. 3, pp. 1 – 2.

Dr. Clem explains that treatment for glaucoma is "typically focused on reducing intraocular pressure," which is usually accomplished "through use of prescription eye drops." *Id.* at Ex. 3, p. 2. Surgery for end-stage glaucoma involves a high risk of complications, making conservative treatment the preferred approach. *Id.*

During the period of time that Wexford has been the contracted medical care provider, Plaintiff received the treatment outlined below.

On August 23, 2012, while housed at Maryland Correctional Institution Hagerstown ("MCIH"), Plaintiff was seen by Dr. Sadik Ali for his complaint of left eye pain. Dr. Ali noted that Plaintiff's left eye was bulging and that his condition was being followed by Dr. Summerfield, who is an opthalmologist. Dr. Ali prescribed Naprosyn for Plaintiff's pain and wrote an order for Plaintiff to be seen by Dr. Summerfield. In addition, Plaintiff was receiving Xalatan, Pred Forte, and Atroppine eye drops at that time.

The following day, Plaintiff was approved for a CT scan to be performed at Bon Secours Hospital to assist in the treatment of his glaucoma. On September 14, 2012, the day Plaintiff was to receive the CT scan, he refused to go on the medical trip and signed a release of responsibility. *Id.* at Ex. 3, p. 3. In the interim, Plaintiff was provided with an eye patch. *Id.*

Plaintiff complained again of left eye pain on March 7, 2013, and was seen by a registered nurse who referred him to a doctor for evaluation. Plaintiff was seen that day by Dr. Jonathan Thompson, who placed an order for an on-site consultation with an opthalmologist the following day. *Id.* at Ex. 3, pp. 3 – 4.

Plaintiff complained of eye pain in both eyes on May 8, 2013, and told the registered nurse who saw him he believed the eye drops prescribed to him were causing the pain. Plaintiff was again referred to optometry. *Id.* at Ex. 3, p. 4.

On October 25, 2013, Plaintiff was seen for an on-site ophthalmology evaluation which included dilation examination and intraocular pressure assessment. Dr. Green-Simms reported that the visual acuity in Plaintiff's right eye, without correction, was 20/140. Plaintiff's left eye had no light perception. The intraocular pressure on both of Plaintiff's eyes at that time was 8 and all other aspects of Plaintiff's eyes were also within normal limits. The only recommendation made by Dr. Green-Simms was that Plaintiff's job assignment in the metal shop was not advisable given the risk posed to the vision in his right eye. *Id.* at Ex. 3, p. 4.

On November 12, 2013, Plaintiff was seen by the on-site optometrist for purposes of an eye examination for glasses. He received the glasses on December 18, 2013. *Id.* at Ex. 3, p. 5.

On February 19, 2014, during a chronic care visit with Dr. Purcell Bailey, it was noted that Plaintiff's glaucoma was stable. Plaintiff did not voice any complaints during the visit. *Id.* at Ex. 3, p. 5.

4

On March 29, 2015, Plaintiff complained of left eye pain and was seen by a registered nurse. During the appointment Plaintiff simply requested a medical order to allow for curtains in his cell to remain closed. His request was referred to a doctor to evaluate the need for same. Dr. Thompson saw Plaintiff on April 2, 2014, regarding the request for closed curtains in his cell. Plaintiff explained to Dr. Thompson that light causes pain in his eyes and Dr. Thompson wrote a medical order permitting the curtains to remain closed. *Id.* at Ex. 3, p. 5.

On July 11, 2014, Plaintiff was transferred from MCIH to ECI. At that time, Plaintiff had four sets of glasses and sunglasses. *Id.* at Ex. 3, p. 6.

On July 23, 2014, Plaintiff complained of lightheadedness and was seen by a nurse. He reported that light bothered his eyes and that when he laid down he felt like the room was spinning. He further stated that while he was at MCIH he had a single cell and at ECI he was now assigned a cellmate who kept lights on all the time. He requested a single cell and was referred to a doctor for evaluation of the request. *Id.* at Ex. 3, p. 6.

On July 25, 2014, Plaintiff again complained of eye pain and was seen by a nurse. Plaintiff described the pain as severe and asked to have his eye removed. Plaintiff's eye was described as deformed in color and appearance. In addition, Plaintiff complained of light sensitivity and requested a medical order for sunglasses, permission to cover his window, and a single cell. It was noted that Plaintiff was crying during the visit. *Id.* at Ex. 3, p. 6.

On July 27, 2014, Plaintiff was seen by a physician's assistant for chronic care. Plaintiff reported again that he was sensitive to light and he could not sleep because his cellmate liked to read. Plaintiff was referred to an opthalmologist. *Id.* at Ex. 3, p. 6.

On August 7, 2014, Plaintiff was seen by opthalmologist Dr. Summerfield. At that time, the visual acuity in Plaintiff's right eye without correction was 20/200; his left eye had no light

perception.  The intraocular pressure for Plaintiff's eyes measured 13 and 14, which is within normal limits.  Plaintiff reported to Dr. Summerfield that he suffered severe eye pain, despite attempts to treat it.  Dr. Summerfield suggested removal of Plaintiff's left eye, or enucleation, to control the pain.  A consultation request was made for the surgery.  On August 27, 2014, the surgery for removal of Plaintiff's left eye was approved.  *Id.* at Ex. 3, pp. 6 – 7.

On September 5, 2014, Plaintiff was seen by a nurse for his complaint of dizziness and headache.  At that time it was noted Plaintiff's left eye was red and surgery for its removal was pending.  Plaintiff was given Tylenol for his headache and was advised to stay out of light as much as possible; he was using dark sunglasses at the time to protect his eyes.  *Id.* at Ex. 3, p. 7.

On September 13, 2014, Plaintiff received a preoperative evaluation and was cleared for surgery by P.A. Carl Ottman.  A medical order for a single cell was written that day by Ottman.  *Id.* at Ex. 3, p. 7.

On September 22, 2014, Plaintiff returned from the medical trip for his scheduled surgery.  Plaintiff had refused to go through with the surgery.  He was cleared to return to his housing unit.  On September 29, 2014, Plaintiff was seen by P.A. Pinkney whom he informed that he wanted to have the surgery on his left eye and explained that he panicked when he received the anesthesia and stopped the procedure.  Plaintiff renewed his request for a single cell, but Pinkney noted a single cell was not indicated for Plaintiff's condition.  Dr. Clem was notified of Plaintiff's change of heart regarding the surgery and advised moving forward with the surgery.  *Id.* at Ex. 3, pp. 7 – 8.

On October 28, 2014, when Plaintiff was again seen by P.A. Ottman, he asked Ottman for an order requiring his assignment to a single cell.  Ottman wrote another order for Plaintiff's assignment to a single cell.  *Id.* at Ex. 3, p. 8.

On November 6, 2014, Plaintiff was seen by Dr. Summerfield, who noted Plaintiff's uncorrected visual acuity in his right eye was 20/200. The intraocular pressure in Plaintiff's eyes was within normal limits at 9 and 7. At that time, Plaintiff was using prescribed eye drops, Brimonidine Tartate and Timoptic, which he reported provided relief. No recommendation for off-site specialist care was made by Dr. Summerfield. *Id.* at Ex. 3, p. 8.

On August 3, 2015, Plaintiff was seen by a nurse after he made a request to be seen by an eye doctor. During the visit Plaintiff advised that his sunglasses had broken. A consultation was written for Plaintiff to be seen by Dr. Summerfield. Two days later, Plaintiff reported that his eyesight was worsening and his name was placed on the earliest schedule to be seen by an opthalmologist. *Id.* at Ex. 3, p. 9.

On August 10, 2015, Plaintiff was seen by the on-site optometrist; his uncorrected visual acuity in his right eye was 20/400. A new prescription was written for dark-tinted corrective eye wear and a referral for evaluation by an opthalmologist was written due to the decrease in Plaintiff's visual acuity. *Id.* at Ex. 3, p. 9.

On August 27, 2015, Plaintiff was seen by Dr. Summerfield who confirmed his uncorrected visual acuity in the right eye was 20/400. Intraocular pressure remained within normal limits at 13 and 9. Plaintiff was prescribed Brimonidine Tartate, Xalatan, Atropine, and Timoptic eye drops. No recommendation was made for evaluation by an off-site specialist. *Id.* at Ex. 3, pp. 9 – 10.

On August 31, 2015, Plaintiff was seen by Nurse Practitioner Judith Hearthway for a chronic care visit. Plaintiff complained of bilateral eye pain and explained he did not want surgery performed at Bon Secours Hospital and was refusing the procedure so that it could be performed at University Hospital or Salisbury Hospital instead. Plaintiff denied needing to see

an opthalmologist at this appointment. *Id.* at Ex. 3, p. 10.

On October 8, 2015, Plaintiff was seen by Dr. Goodman, an opthalmologist, for evaluation. Plaintiff's uncorrected visual acuity in his right eye remained at 20/400. Intraocular pressure remained in acceptable ranges at 12 and 9. Goodman described Plaintiff's eye condition as stable and made no recommendation to refer Plaintiff an off-site eye specialist. *Id.* at Ex. 3, p. 10.

On October 24, 2015, Plaintiff was seen by a nurse for his complaint that he could not work due to the pain in his eyes. He was provided a written excuse from work and Dr. Summerfield was emailed regarding the pain Plaintiff was experiencing. Dr. Summerfield responded that he was unsure anything other than the prescription eye drops already being used and enucleation would be viable options for Plaintiff. *Id.* at Ex. 3, pp. 10 – 11.

Dr. Clem avers that a single cell is not medically indicated for Plaintiff. *Id.* at Ex. 3, p. 11. He adds that Plaintiff has "adequate vision out of his right eye" and that he is able to perform all daily living activities, including work. *Id.*

<u>Correctional Defendants' Response</u>[2]

Warden Kathleen Green states in a declaration under oath that she has no authority or control over the provision of medical care to inmates. ECF 16 at Ex. 1, p. 1. She further states that she defers to the expertise of medical staff regarding medical care and treatment provided to the inmate population. *Id.* When responding to internal complaints filed by inmates regarding medical care, Green states that she relies on the reports, assessments, and judgments of the trained medical staff to prepare her response. *Id.* at p. 2.

Lt. Alonzo Murphy states in his declaration under oath that he is assigned to the housing

---

[2]   Although both Defendant Green and Murphy aver that "attached records" meet the standard for verified business records, there are no records attached to the Motion to Dismiss or for Summary Judgment filed on their behalf. ECF 16 at Ex. 1 and 2.

unit where Plaintiff was housed as a general population inmate.  He claims that none of the staff

in the housing unit were aware of any medical orders regarding Plaintiff's housing assignment.

ECF 16 at Ex. 2, p. 1.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

<u>Statute of Limitations</u>

"Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: it is that which the State provides for personal-injury torts." *Wallace v. Kato,* 549 U.S. 384, 387 (2007), citing *Owens v. Okure,* 488 U.S. 235, 249-250, (1989); *Wilson v. Garcia,* 471 U.S. 261, 279-280, (1985). In Maryland the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Cts. & Jud. Proc. Code Ann. § 5-101.

Plaintiff's claim against the unserved Defendant, Dr. Doyle, whom he alleges caused the blindness in his left eye when he used the wrong type of drops in Plaintiff's eye, is time-barred. The date Dr. Doyle is alleged to have injured Plaintiff is in 2001; the instant Complaint was filed July 23, 2015. The claim as to Dr. Doyle must be dismissed.

<u>Eighth Amendment Medical Claim</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with

10

deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflictor . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to a known risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Plaintiff's claim regarding the adequacy of the medical care he has been provided is based on his belief that the on-site opthalmologists have "done something" to damage his right eye because the vision has worsened and it is painful. ECF 19 at p. 5; ECF 22 at p. 1.  He further claims that Bon Secours Hospital does not provide good care to inmates (ECF 19 at p. 10) and that the on-site opthalmologists have a contract with Bon Secours Hospital (*id.* at p. 5). Plaintiff's suspicion is that the on-site opthalmologists are attempting to cover-up an error they made with respect to his right eye by refusing to send him to a hospital other than Bon Secours. *Id.* at p. 8.  He maintains he should be sent to University of Maryland or Johns Hopkins for care because he was treated at those facilities as a child and before he was incarcerated. ECF 19 at p. 10.

The objective evidence provided by Wexford in the form of medical records and a sworn statement from Dr. Clem establishes that Plaintiff has received constitutionally adequate care. To the extent that care is not what Plaintiff prefers or is not the best care available for his serious condition, the Eighth Amendment does not require more than what he has received.   While Plaintiff's concern regarding the loss in visual acuity and the increase in pain is well-founded, it appears his concerns are being addressed within the limitations he has placed on the medical care providers.  The surgical removal of Plaintiff's left eye was scheduled and approved to address the pain he experiences in that eye; however, Plaintiff withdrew his consent.  The intraocular pressure in Plaintiff's eyes is measured on a regular basis and does not indicate that his glaucoma is not being adequately controlled with the medications being provided.  Wexford is entitled to summary judgment in its favor.

Plaintiff also claims that he has been improperly denied a single cell assignment for medical reasons, given his poor eyesight. ECF 19 and 22.  He suggests that Dr. Clem's opinion

12

that Plaintiff does not need a single cell is based on the fact that Dr. Clem has never met him personally.  ECF 22.  Plaintiff suggests that Dr. Clem has confused him with another prisoner and insists that he is handicapped, cannot work, and requires a single cell.  *Id.*  Additionally, Plaintiff states that he wrote to Warden Green numerous times in an effort to get his broken glasses and sunglasses replaced (ECF 21) and that Lt. Murphy told a registered nurse that no medical order for a single cell should be issued for Plaintiff.  ECF 20 and 21.

Plaintiff is correct that a medical order for a single cell was approved by Physician's Assistant Ottman (ECF 14 at Ex. 1, pp. 56 (Ottman's Order), 63 (record referencing order)); however, none of the other providers who treated Plaintiff agreed with Ottman's opinion that Plaintiff required a single cell because of his visual impairment.  Other accommodations were provided.  An order permitting Plaintiff to have curtains over the window in his cell to block out bright light (*id.* at pp. 36, 89, and 122) and one prohibiting Plaintiff's assignment to work in the metal shop due to concerns for risks posed to his right eye, were provided (*id.* at p. 104).  Indeed, Plaintiff himself does not provide a cogent reason supporting his assignment to a single cell other than his previous assignment to one at MCIH.  The failure to provide a single cell to Plaintiff does not state an Eighth Amendment claim.

A separate Order follows.

Dated: April 21, 2016

/s/
William M. Nickerson
Senior United States District Judge